# United States District Court
# Northern District of Alabama
# Southern Division

02 DEC -4 PM 3: 14

U.S. DISTRICT COURT
N.D. OF ALABAMA

Thomas D. Arthur,     ]

    Petitioner,     ]

vs.     ]    CV-01-N-0983-S

Michael Haley, Commissioner,     ]
Alabama Department of     ]
Corrections,     ]

    Respondent.     ]

**ENTERED**

DEC 0 4 2002

## Memorandum of Opinion

This is an action for habeas corpus relief under 28 U.S.C. § 2254 by an Alabama state prisoner under a sentence of death. With the assistance of counsel, Thomas D. Arthur ("Arthur") filed his petition on April 20, 2001, challenging his December 5, 1991, state court murder conviction. The cause is presently before the court to determine if there is sufficient reason to excuse Arthur's failure to file his petition within the one-year period imposed by The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d)(1). The AEDPA statute of limitations was raised in the Respondent's April 23, 2001, Motion to Dismiss, and the issue has been fully briefed by the parties. For the reasons set out below, the court finds no lawful ground to excuse the untimeliness of the petition. Accordingly, the petition for the writ of habeas corpus is due to be, and will be, dismissed.

## BACKGROUND

1.     Arthur's first conviction and sentence of death for the murder of Troy Wicker was reversed by the Alabama Supreme Court on May 10, 1985. *Ex parte Arthur*, 472 So. 2d 665

55

(Ala. 1985)(details of a prior murder were improperly admitted at trial under the identity exception to general exclusionary rule).

2.      Arthur was convicted and sentenced to death a second time for the Troy Wicker murder, but his second conviction and sentence were reversed by the Alabama Court of Criminal Appeals. *Arthur v. State*, 575 So. 2d 1165 (Ala. Crim. App. 1990)(trial court improperly admitted a statement made by the defendant to a police officer in the absence of counsel two weeks after he had asserted his right to remain silent), *cert. denied, Ex parte State of Alabama [Re Arthur v. State]*, 575 So. 2d 1191 (Ala. 1991).

3.      Arthur was tried a third time for the murder of Troy Wicker and convicted on December 5, 1991. (CR. 11, R. 1150).[1] The trial court, following the jury's recommendation, sentenced Arthur to death on January 24, 1992. (CR. 12, 14-27; R. 1237, 1291-1300).

4.      The Alabama Court of Criminal Appeals affirmed Arthur's conviction and death sentence on March 8, 1996. *Arthur v. State*, 711 So. 2d 1031 (Ala. Crim. App. 1996).

5.      The Alabama Supreme Court affirmed the decision of the Court of Criminal Appeals on November 21, 1997. *Ex parte Arthur*, 711 So. 2d 1097 (Ala. 1997). Arthur's application for rehearing was denied on March 20, 1998. (State's Answer and Motion to Dismiss, Doc. 6, Ex. A).

---

[1] The record in this case consists of eleven numbered volumes comprising the proceedings at Arthur's capital murder trial, one volume comprising a supplemental record on appeal, and various loose documents memorializing the state collateral proceedings which have been attached to various pleadings filed in this court. The eleven numbered volumes include 880 numbered pages comprising the clerk's record, followed by the separately numbered transcript of the proceedings before Judge Hard. For citation purposes, the court will follow the state's example and refer to the initial 880 pages of the eleven numbered volumes as the "Clerk's Record"("CR.") to distinguish them from the separately numbered transcript "Record" ("R."). Similarly, the initial pages in the single Supplemental Volume will be referred to as "Supplemental Clerk's Record" ("SCR.") and the following transcript pages will be referred to as the "Supplemental Record" ("SR."). Documents filed in this court will be referenced, as is this court's usual practice, by the docket number and exhibit reference, if any.

6.      Arthur did not petition for the writ of certiorari to the Supreme Court of the United States, nor did he seek state or federal collateral review at any time before January 25, 2001.

7.      On September 15, 2000, the State filed an "Amended Motion to Set Execution Date" in the Supreme Court of Alabama. (Doc. 46, Ex. 1).

8.      On January 25, 2001, Arthur, proceeding through counsel, filed his Rule 32 Petition in the Tenth Judicial Circuit Court of Jefferson County, Alabama. (Doc. 47, Ex. 1, 2). The Rule 32 Petition was dismissed as untimely on March 5, 2001. (Doc. 47, Ex. 4).

9.      On March 23, 2001, the Alabama Supreme Court entered its order setting Friday, April 27, 2001, as Arthur's execution date. (Doc. 46, Ex. 3).

10.     On March 28, 2001, Arthur filed a motion to reconsider the dismissal of his Rule 32 petition in the Tenth Judicial Circuit Court of Jefferson County Alabama, (Doc. 47, Ex. 5), and on April 4, 2001, Arthur filed a "Motion for Stay of Execution" in the Alabama Supreme Court. (Doc. 47, Ex. 6).

11.     On April 11, 2001, the Alabama Supreme Court denied Arthur's motion to stay his execution. (Doc. 47, Ex. 8).

12.     On April 20, 2001, Arthur filed his "Petition for Writ of Habeas Corpus" and his "Motion for Stay of Execution" in this court. (Doc. 1, 3). After consideration of written and oral arguments, this court entered its order granting Arthur's motion for stay on April 25, 2001. (Doc. 11). The Eleventh Circuit Court of Appeals denied Respondent's motion to vacate or dissolve the stay on April 26, 2001. (Doc. 16).

13.     Because Arthur's March 28, 2001, motion to reconsider was pending in the Tenth Judicial Circuit Court of Jefferson County Alabama, (Doc. 47, Ex. 5), this court stayed

3

consideration of the present habeas corpus petition until the conclusion of the state court proceedings initiated by Arthur's Rule 32 petition. (Doc. 11).

14.     The Alabama Court of Criminal Appeals affirmed the denial and dismissal of the state post-conviction petition on April 25, 2001. *Arthur v. State*, 820 So. 2d 886 (Ala. Crim. App. 2001). State court review of Arthur's Rule 32 petition concluded when the Alabama Supreme Court denied Arthur's petition for the writ of certiorari on November 2, 2001. (Doc. 49).

15.     On May 13, 2002, the United States Supreme Court denied Arthur's petition for writ of certiorari from his state court Rule 32 proceedings. (Doc. 32).

## DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year period of limitations for writs of habeas corpus. 28 U.S.C. § 2244(d)(1).[2] Unless the exceptions set out in § 2244(d)(1)(B), (C), or (D) apply, the limitation period runs from the latest of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). In Arthur's case, direct review concluded when the Alabama Supreme Court denied the motion for reconsideration on March 20, 1998, and, therefore, the time for seeking review in the United States Supreme Court expired on June 18, 1998. S. Ct. R. 13 (". . . a petition for writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last

---

[2]The one-year limitations period does not include the time during which a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim" is pending in the state court. 28 U.S.C. § 2244(d)(2). *Artuz v. Bennett*, 531 U.S. 4 (2000). Arthur did not seek post-conviction or collateral review in the Alabama courts prior to the expiration of the one-year AEDPA limitations period and he does not claim here that the limitations period was tolled at any time pursuant to 28 U.S.C. § 2244(d)(2). *See Webster v. Moore*, 199 F.3d 1256, 1259 (11th Cir. 2000) (state court petition filed after the expiration of the AEDPA limitations period does not toll the period because there is no period remaining to be tolled).

4

resort, . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of judgment).[3] Arthur did not file his current habeas petition until April 20, 2001, approximately 21 months after AEDPA's one year limitation period expired.

Arthur claims this court should excuse his dilatory filing and reach the merits of his claim because he is actually innocent of the crime for which he was thrice convicted. Arthur further claims he is entitled to statutory or equitable tolling of the one-year limitations period. Arthur has also filed a "Motion for Leave to Conduct Discovery" (Doc. 33), seeking access to physical evidence and documents he claims are applicable to his threshold claims.

## I.    Discovery

Arthur seeks access to physical evidence, including Judy Wicker's clothing, a rape kit created the day of the murder, a wig and hair samples collected from Judy Wicker's car, vacuum sweepings and a hair sample from the Wicker residence, a bullet, spent cartridge casings, and a pillowcase. He also seeks documents covering the period 1998 through 2000 concerning the death row law library at Holman Prison, showing which books and materials were carried, how they were organized, the library's budget, availability of materials, other activities in the vicinity, and access to the library. Arthur claims he has shown the "good cause" required by Rule 6(a) of the Rules Governing Section 2254 Cases because the discovery requests are "directly relevant" to his claim that the AEDPA statute of limitations should not bar review of his petition.

---

[3]The United States Court of Appeals has recently held that AEDPA's one year limitations period begins to run when the time for filing a petition for the writ of certiorari with the United States Supreme Court has expired. *Bond v. Moore*, 309 F.3d 770, (11th Cir. 2002) (No.00-16544, October 10, 2002).

A habeas petitioner is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rule 6(a) of the Rules Governing § 2254 Cases permits discovery upon a showing of good cause, which requires "specific allegations" showing reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to habeas relief. *Id.* at 908-09. "In passing AEDPA . . . Congress modified the discretion afforded to the district court and erected additional barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing." *Isaacs v. Head*, 300 F.3d 1232, 1248-49 (11th Cir. 2002) (applying the diligence standard of 28 U.S.C. § 2254(e)(2) to petitioner's request for discovery and evidentiary hearing). When a habeas petitioner has failed to develop the factual basis for his claims in State court proceedings he must satisfy the stringent conditions of 28 U.S.C. § 2254(e)(2). *See Williams v. Taylor*, 529 U.S. 420 (2000).[4]

Arthur theorizes that tests of the rape kit and other evidence might place another malefactor at the scene and thereby undermine Judy Wicker's testimony that she hired Arthur to kill her husband. He points to Wicker's prior testimony that an African American man forced his way into her home, beat her, raped her, and killed her husband,[5] and he speculates that the test results might support this alternate version of events. Arthur's conjectures fall far short of the specific allegations required by *Bracy* to establish good

---

[4] In his June 3, 2002, brief, petitioner argued that he need not satisfy the more stringent AEDPA standard to obtain discovery because he is not requesting an evidentiary hearing. The Eleventh Circuit's subsequent decision in *Isaacs* indicates otherwise. In any event, Arthur has failed to establish the "good cause" required for obtaining Rule 6 discovery under *Bracy*.

[5] In response to questioning at Arthur's last trial, Wicker testified that Arthur concocted the earlier story.

cause for discovery.[6] Moreover, discovery must be aimed at obtaining evidence to support a constitutional claim. *Bracy*, 520 U.S. at 905-06. At best, Arthur proposes to impeach Judy Wicker's testimony, and none of his speculations, if proven, would establish he is actually innocent under either the "more likely than not" standard or the "clear and convincing" standard. *Compare Schlup v. Delo,* 513 U.S. 298 (1995)(gateway claim that petitioner is actually innocent of crime is established by evidence that petitioner is "more likely than not" innocent) and 28 U.S.C. § 2254(e)(2)(evidentiary hearing warranted if, *inter alia*, the facts underlying claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense).[7] *See Sawyer v. Whitley*, 505 U.S. 333, 349 (1992)(". . .latter-day

---

[6]Although Arthur generally claims that a new examination of the evidence might obtain results contrary to Wicker's version of events, his specific allegations do not support his claim. He has a notion that blood typing or DNA testing of Judy Wicker's bloody clothing might show someone else assaulted her, but there is no basis in the record for his belief that the blood on her clothing belonged to her assailant. Rather, the evidence was that Wicker was assaulted from behind, did not struggle, and was bleeding due to extensive head and face injuries. Arthur contends examination of the rape kit and vacuum sweepings could support Wicker's prior testimony about being assaulted and raped by someone else, but merely showing another person was with Judy Wicker or in her home at some unspecified time does little to support her prior testimony or further impeach her testimony about Arthur's involvement. At best, it would provide some additional inference about Judy Wicker's veracity, a subject which was amply covered during the trial. Arthur also speculates that DNA tests of the wig and hair samples from the car could show Wicker fabricated her testimony that Arthur wore a wig and dark face makeup to disguise himself as a "black man." However, expert testimony at the trial indicated the hair samples were of African American origin. Arthur provides no support for his speculation that different tests could impeach Wicker's testimony. Experts testified the cartridge casings and bullets were consistent with the type of ammunition Patricia Green obtained for Arthur on the day prior to the murder. Arthur hopes that his tests might now show an inconsistency, but does not explain the reasons for his expectation. Finally, Arthur seeks to resolve a discrepancy he perceives in the evidence. He points to expert testimony indicating gunpowder residue on the pillowcase found beneath Troy Wicker's head show the murder weapon was not discharged at close range. This, he argues, conflicts with Wicker's testimony that her husband was shot while sleeping and the autopsy report that Troy Wicker died of a gunshot wound to the right eyelid "fired at a close range." He seeks to examine the pillowcase and crime scene photographs to resolve this discrepancy. Judy Wicker did not testify about the distance between the killer and her husband so the discrepancy is not relevant to her testimony. Any discrepancy between the expert witnesses was heard and resolved by the jury and no further investigation is warranted.

[7]*Isaacs v. Head*, 300 F.3d 1232 (11th Cir. 2002), further indicates that Arthur's request for release of the physical evidence is due to be denied because he failed to exercise "due diligence" in pursuing the facts during the state proceedings.

evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of [the witness's] account. . . ."). Discovery is not warranted unless there is reason to believe the results would demonstrate entitlement to habeas relief. *Bracy*, 520 U.S. at 908-09.

Arthur's request for discovery regarding the death row law library is similarly deficient. The request relates solely to his tolling claims, and the results would not bear any relation to his guilt or innocence of the crime or otherwise support a constitutional claim entitling him to habeas relief. *Bracy*, 520 U.S. at 905-06 (court must identify the essential elements of constitutional claim in order to determine whether discovery would establish claim); *Harris v. Nelson*, 394 U.S. 286, 300 (1969) (court should facilitate discovery where full development of specifically alleged facts would demonstrate petitioner is confined illegally and is thus entitled to habeas relief); 28 U.S.C. § 2254(e)(2)(B) (evidentiary hearing is warranted where underlying facts could not be previously discovered through exercise of due diligence and would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found applicant guilty of underlying offense).

For the foregoing reasons, Arthur's request for discovery will be denied.

## II.    Actual Innocence

Like others before him, Arthur claims an "actual innocence" exception to the AEDPA limitation period is necessary to avoid an unconstitutional suspension of the writ. *See Wyzkowski v. Dep't of Corrections*, 226 F.3d 1213 (11th Cir. 2000). The Eleventh Circuit has yet to decide whether there is such an exception to the AEDPA limitations period, but has

8

left the door open for consideration of the constitutional question in a case in which the petitioner is able to make a showing of actual innocence. *Wyzkowski*, 226 F.3d at *Id.* at 1217-18(the constitutional question need not be addressed unless and until an untimely petitioner is able to make a sufficient showing of actual innocence). This court, then, has the initial task of determining if Arthur has made a showing of actual innocence sufficient to trigger the duty to evaluate the constitutional question. Upon examination of the evidence Arthur has proffered, the court is satisfied Arthur cannot meet that high standard.

Although the federal courts have long recognized that an otherwise barred petition should be reviewed to avoid a miscarriage of justice when the petitioner presents sufficient evidence of his actual innocence, different standards have been used to determine whether the petitioner has made the threshold showing sufficient to permit review. *Calderon v. Thompson,* 523 U.S. 538, 559 (1998)("Although demanding in all cases, the precise scope of the miscarriage of justice exception depends on the nature of the challenge brought by the habeas petitioner"). *See* 28 U.S.C. § 2244(b)(2)(except for claims based on new constitutional law made retroactive by the United States Supreme Court, consideration of any new claim in a second or successive petition is permitted when the petitioner shows, *inter alia*, the facts underlying the claim establish his innocence by clear and convincing evidence); *Schlup v. Delo*, 513 U.S. 298, 322 (1995)(petitioner claiming actual innocence of the underlying crime must show it is "more likely than not" that no reasonable juror would have convicted him in light of new evidence); *Sawyer v. Whitley*, 505 U.S. 333 (1995)(petitioner challenging death sentence must show by clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty in light of new

evidence); *Herrera v. Collins*, 506 U.S. 390 (1993)(where petitioner has no claim of constitutional error at trial, he must show actual innocence of the crime by clear and convincing evidence to proceed with successive or abusive writ). This court need not linger over esoteric questions regarding the appropriate standard in this case, however, because the proffered evidence is insufficient to meet the "actual innocence" threshold even upon application of the more lenient "more likely than not" test. *See Calderon*, 523 U.S. at 558(tension between *Sawyer* and *Schlup* standards need not detain court where claims fail under either standard).

The miscarriage of justice standard is concerned with actual as compared to legal innocence. *Sawyer*, 505 U.S. at 339. To demonstrate actual innocence the petitioner must present "new reliable evidence that was not presented at trial" and show, in light of all the evidence, "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 299, 327-28.

The evidence at Arthur's third trial established that Troy Wicker was fatally shot on February 1, 1982, while he lay in bed at his home in Muscle Shoals, Alabama. The prosecution presented the testimony of Mary Jewel (Judy) Wicker, the wife of the victim, who testified that she had a sexual relationship with Arthur and that she paid Arthur $10,000 to murder her husband.

Talmadge Sterling, an employee of the Decatur Work Release Center at the time of the murder, testified that Arthur was an inmate of the center, but was signed out for work between 6:00 a.m. and 7:50 p.m. on the day of the murder. Arthur was assigned to work at Reagan Mobile Homes but the operator of the business, Joel Reagan, testified he was an old

10

acquaintance of Arthur's and, because Arthur's day to day activities at the business were not closely supervised, he did not know Arthur's whereabouts on the day of the murder. Patricia Yarborough Green testified that Arthur frequented Cher's Lounge, where she worked. He came in four to five days a week, sometimes in the company of Joel Reagan. Debra Lynn Phillips, the operator of Cher's Lounge and Arthur's paramour, also testified Arthur came to the bar four to five times per week, usually in the afternoon. Pat Halliday, a shift supervisor at Decatur Work Release Center in 1982, testified there was a discrepancy between the number of hours Arthur was away from the center and the number of hours he was actually paid for working in February and March of 1982.

Patricia Yarborough Green further testified that, on the day before the murder, she helped Arthur obtain .22 caliber mini mag long rifle bullets and that Arthur told her the bullets would be used to kill someone. Brent Wheeler, director of the Huntsville Forensic Lab in 1982, testified that the bullet removed from Troy Wicker's body was a .22 long rifle caliber consistent with a CCI brand mini mag. The four shell casings found near the body were CCI brand .22 long or long rifle casings.

In addition to the evidence tending to show Arthur had the opportunity and means to kill Troy Wicker, other evidence substantiated Judy Wicker's testimony. Joel Reagan testified he saw Judy Wicker and Arthur together at the mobile home business. Judy Wicker stated that, on the morning of the murder, she dropped her sons at school, drove back and forth on Avalon Avenue a couple of times and then picked Arthur up near the airport. This testimony was consistent with the testimony of Charles Eddie Lang, a Muscle Shoals Police officer who was serving as a school crossing guard on Avalon Avenue that morning, and

observed Ms. Wicker twice pass by the crossing prior to 8:00 a.m., when he left his post. Ms. Wicker also testified that Arthur wore an "afro" wig and makeup to disguise himself as a black man, and this was consistent with the testimony of John Kilbourne of the Alabama Department of Forensic Science at Huntsville, who stated that hair gathered by Joseph Gary Wallace from Ms. Wicker's car was negroid head hair. Wicker testified Arthur was carrying a gun and a garbage bag. Phillips testified Arthur was supposed to meet her for lunch on the day of the murder, but he was late and, instead of going to lunch, they rode to a bridge over the Tennessee River where Arthur stopped the car and threw a partially filled garbage bag wrapped in a sheet into the river.

Moreover, Arthur had a large amount of money in his possession after the murder, consistent with Wicker's testimony that she paid him for the murder out of the insurance on Troy Wicker's life. Pat Halliday testified that Arthur was transferred to the Morgan County Jail after the discovery of the discrepancy between the number of hours he was away from the center and the number of hours he was actually paid for working. Upon routine inspection of his effects prior to the transfer, twenty one hundred dollar bills were discovered in an envelope in Arthur's overcoat pocket.[8]

Arthur's claim of actual innocence rests on affidavits from Alphonso High, Ray Melson, and Billy Peebles. Doc. 36; Exhibits to Doc. 41. Mr. High attested that Arthur visited him "around 9 a.m." the morning of February 1, 1982, at his Decatur place of business,

---

[8] At trial, Arthur presented testimony from Bruce Carroll, who said he lost $6500 to Arthur in a poker game, and testimony from Gene Moon, who said that Hillard Murray gave him money to put in Arthur's coat pocket. Arthur also presented the testimony of Ronald Spears, who said Patricia Green lied in her testimony about procuring bullets for Arthur because she was threatened.

Copper Mobile Homes.[9] He stated that he believed Arthur was driving his Ford LTD and that they had a 30 minute conversation about setting up a trailer in Birmingham. Mr. High further stated that he heard about the murder of Troy Wicker on the following day and, when he heard Arthur was arrested for the murder about two months later, he recalled he had spoken with Arthur on the morning of the murder. Mr. Melson also stated he saw Arthur at Copper Mobile Homes between 8:00 a.m. and 9:00 a.m. that day.[10] Mr. Peebles stated that it was Arthur's habit to arrive at work at Reagan Mobile Homes at 7:30 a.m. and take a bubble bath until 8:00 a.m.

In response to Arthur's submission, the state procured additional statements from the affiants. Doc. 39, 53. In his second statement, Mr. High stated that he was not sure if he saw Arthur on February 1, 1982, or on another day in late January or early February of that same year. In his second statement, Mr. Peebles clarified that he could only state that Arthur's habit was to take a bubble bath between 7:30 and 8:00 a.m. but that he could not state that Arthur bathed every morning or that he was bathing on the morning of February 1, 1982. Finally, Mr. Melson stated that he signed the first affidavit while he was under the influence of strong prescription medication, and he revised his statement to say that he saw Arthur

---

[9] Arthur submitted the affidavit of Stephen J. Gustat, a licensed private investigator from Tampa, Florida, who attested that, on Sunday, June 9, 2002, he drove the distance between the address of the Wicker home and the former location of the Copper Mobile Homes and ascertained that the drive took approximately 60 minutes.

[10] Arthur submitted the Melson affidavit with his reply brief, triggering an unsolicited response from the State to which Arthur responded as discussed above. These dueling affidavits serve only to demonstrate the unreliability of the affiants. Moreover, submitting them, as he has, many years after the events in question, Arthur can hardly expect the necessary finding of due diligence that would entitle him to an evidentiary hearing to resolve discrepancies in the witnesses' stories. 28 U.S.C. § 2254(e)(2).

between 7:30 or 10:00 in the morning but he could not be sure that the date was February 1, 1982.[11]

In view of the witnesses' tendencies to change their statements and Arthur's long delay in presenting this evidence the affidavits Arthur submitted are not sufficiently reliable to cast doubt on the jury's verdict. A claim of actual innocence must be supported with "new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Schlup*, 513 U.S. at 324; cf. *Herrera*, 506 U.S. at 423-24 (O'Connor, J., concurring)(observing that affidavits produced at the 11th hour with no reasonable explanation for long delay were suspect).

Furthermore, pretermitting questions of credibility, Arthur's lately acquired affidavits do not raise "sufficient doubt about [his] guilt to undermine confidence in the result of the trial . . ." *Schlup*, 513 U.S. at 317. The jury heard direct evidence of Arthur's involvement in the murder in the form of Judy Wicker's testimony. Other evidence was introduced that corroborated significant portions of Wicker's testimony. Actual innocence "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329. In view of the significant evidence of guilt presented at Arthur's trial, this is not that

---

[11]Arthur claims, with a supporting affidavit from one of his attorneys, the State coerced the revised statements because one of the State representatives was visibly carrying a weapon. The State responded with additional evidence tending to show the statements were not coerced. This court need not resolve the issue since the change in the statements alone strengthens the conclusion that the statements are unreliable and Arthur has not shown he was diligent in pursuing this alibi evidence, so that he is not entitled to an evidentiary hearing.

"extraordinary case" in which this court could say a constitutional error "probably" resulted in the conviction of one who was actually innocent. *Id.* at 322, 327.

Finally, Arthur has requested a hearing to take testimony from High, Peebles and Melson, but has made no attempt to show he diligently pursued the factual predicate of his alibi claim in state court. 28 U.S.C. § 2254(e)(2). *Isaacs*, 300 F.3d at 1248-49. Arthur claims his attorneys failed to conduct an adequate investigation, but Arthur himself was equally responsible for making "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court. . . ." *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (interpreting 28 U.S.C. § 2254(e)(2)). His whereabouts at the time of Troy Wicker's murder was singularly within Arthur's knowledge, and yet he never made this claim or presented this evidence to *any* state court. In this circumstance, he did not act with due diligence.

### III.    Statutory Tolling

The AEDPA statute of limitations can be tolled until "the date on which [an] impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action." 28 U.S.C. § 2244 (d)(1)(B). "[I]n the event of illegal state action preventing the petitioner from filing, the limitation period does not begin until after the state impediment is removed." *Wyzkowski*, 226 F.3d at 1216. Arthur claims the state unconstitutionally prevented him from filing his petition for collateral relief by failing to provide him with post-conviction counsel or any form of legal assistance and by failing to provide access to adequate law library facilities. He contends that Alabama is

the only death penalty jurisdiction which does not provide capital prisoners with post-conviction counsel, and the failure contravenes evolving standards of decency in violation of the Eighth Amendment.

Neither the Eighth Amendment nor the due process clause requires that an indigent defendant be provided with counsel when seeking state post-conviction relief, even in a capital case. *Murray v. Giarratano*, 492 U.S. 1 (1989); *Pennsylvania v. Finley*, 481 U.S. 551 (1987). Pointing to Justice Kennedy's concurrence, Arthur argues that *Giarratano* does not apply to Alabama's capital prisoners because Virginia's death row prisoners had otherwise obtained counsel and Virginia's prison system was staffed with institutional lawyers to assist in preparing for post-conviction relief.[12] 492 U.S. at 14-15. Arthur contends that, unlike the Virginia petitioner in *Giarratano*, he suffered actual injury because he was unable to obtain counsel to represent him and he had no legal assistance. The State correctly points out that the Supreme Court has subsequently applied *Giarratano* without apparent limitation.[13] Moreover, Arthur's evidence that he failed to obtain private counsel does not satisfy his burden of showing he was actually injured by the State's procedures.

In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court held that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the

---

[12] Arthur contends the concurring opinion operates as the holding of the Court because *Giarratano* was a plurality opinion, citing *Marks v. United States*, 430 U.S. 188, 193 (1977)("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . .'")(quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)).

[13] The State cites *Smith v. Robbins*, 528 U.S. 259, 275 (2000); *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 281 (1998); and *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)(disallowing claim of ineffective assistance of post-conviction counsel because there is no constitutional right to such counsel).

preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance of counsel. *See Lewis v. Casey*, 518 U.S. 343, 346 (1996) (discussing *Bounds*). However, Bounds did not create an abstract, free standing right to a law library or legal assistance. *Casey*, 518 U.S. at 351. An inmate alleging a *Bounds* violation must show actual injury. *Id.* at 349. Alabama provides counsel for inmates pursuing state post-conviction relief whose petitions survive a summary review and Arthur has not presented any evidence that he, or any other Alabama death row prisoner who sought post-conviction counsel from the State, were denied such relief. Rule 32.7(c) of the Alabama Rules of Criminal Procedure provides:

> If the court does not summarily dismiss the petition, and if it appears that the petitioner is indigent or otherwise unable to obtain the assistance of counsel, and it further appears that counsel is necessary to assert or protect the rights of petitioner, the court shall appoint counsel.

*Id.* Summary disposition is an alternative to leave to amend, and leave to amend "shall be freely granted." Rule 32.7(d). Alabama's scheme is similar to the Virginia scheme considered and approved by the Supreme Court plurality in *Giarratano*. 492 U.S. at 5-6 and n.3. Arthur did not avail himself of the Alabama procedures for obtaining post-conviction counsel and thus cannot show he would not have obtained representation if he had made a request under Rule 32.7. His failure to obtain counsel cannot be laid at the State's door in these circumstances.[14]

---

[14]Moreover, nothing the State did prevented Arthur from obtaining counsel to proceed with his federal habeas petition in a timely manner under AEDPA because he could have requested counsel from the federal court. 21 U.S.C. § 848(q)(4)(B); *McFarland v. Scott*, 512 U.S. 849 (1994).

Arthur further contends that *Coleman v. Thompson*, 501 U.S. 722, 755-56 (1991) requires appointment of post-conviction counsel when, as in his case, the post-conviction proceedings are the first opportunity to raise claims of ineffective assistance of trial and appellate counsel. In *Hill v. Jones*, 81 F.3d 1015, 1024-26 (11th Cir. 1996), the Eleventh Circuit declined to find that such an exception to *Finley* and *Giarratano*. Arthur contends *Hill* and the other cases[18] rejecting the argument that *Coleman* created an exception to the *Finley* and *Giarratano* holdings are inapposite, because none involved a petitioner under sentence of death "entirely deprived" of any counsel in post conviction proceedings. However, Arthur's circumstances are similar to the capital petitioner in *Hill,* who had procedurally defaulted his ineffective assistance claims and was barred from any review of those claims. Furthermore, as stated above, Arthur has not shown that any state action "deprived" him of counsel for pursuit of post-conviction proceedings.

Arthur contends that it is of no consequence that post-conviction counsel is made available to Alabama petitioners who survive summary review because the main concern is to protect the ability of an inmate to prepare a petition or complaint. *Bounds v. Smith*, 430 U.S. 817 (1977). However, the *Giarratano* court rejected the notion that *Bounds* required appointment of post-conviction counsel before the filing of a petition. 492 U.S. at 10, n. 5. Again, there is no evidence that Arthur or any other Alabama death row inmate requested

---

[18]Arthur concedes that a number of circuits in addition to the Eleventh Circuit have considered and rejected his argument that *Coleman* created an exception to *Giarratano* when the post-conviction proceedings are the first opportunity to raise an ineffective assistance claim. *Mackall v. Angelone*, 131 F.3d 442 (4th Cir. 1997)(en banc); *Martinez v. Johnson*, 255 F.3d 229, 240-41 (5th Cir. 2001); *Nolan v. Armontrout*, 973 F.2d 615, 617 (8th Cir. 1992); *Bonin v. Calderon*, 77 F.3d 1155 (9th Cir. 1996); *Parkhurst v. Shillinger*, 128 F.3d 1366 (10th Cir. 1997). Doc. 35, p. 19-20, n. 4.

counsel from the State court and was refused or suffered a summary disposition of his claims.

Arthur further argues that the State deprived him of his constitutional right of access to the courts because the death row law library at Holman Prison is inadequate in that volumes are missing and books are scattered about the room. He claims the poor library coupled with the lack of counsel prevented him from having the tools he needed to attack his sentence. *Lewis,* 518 U.S. at 345, citing *Bounds,* 430 U.S. 817 (1977).

In a June 21, 2002, affidavit, Naomi Lyons, a correctional officer at Holman State Prison whose duties include oversight of the prison law library, stated that there is one general library in Holman Prison which contains the current United States Code. Doc. 40, Ex. G. She attested that the death row law library has not been kept current and is used primarily as a day room but death row inmates may request books from the prison law library. *Id.*[16] Arthur does not dispute Ms. Lyon's statement that he had access to the materials from the general prison library, but restricts his argument to the inadequacies of the death row library. See Arthur's Affidavit, attached to Doc. 36. He, therefore, has failed to allege or show any actual injury resulting from the Holman Prison library facilities. *Lewis,* 518 U.S. at 343 (to establish a *Bounds* violation, the "actual injury" that an inmate must demonstrate is that the alleged shortcomings in the prison library have hindered his efforts to pursue a nonfrivolous legal claim). Again, *Bounds* did not create an abstract, free

---

[16] Arthur "reserves the right to dispute the State's factual assertions about the library system" because he was unable to interview Ms. Lyons. Doc. 41, p. 10, n. 2. He further argues that the State did not show that death row inmates were notified they no longer had a library, when and how the death row library was changed to a day room, what procedures exist for requesting a book from the general population library or how many books may be requested and how long they might be kept. As discussed above, Arthur did not disclaim access to the general population library.

standing right to a law library and an inmate claiming a *Bounds* violation must show actual injury. *Lewis,* 518 U.S. at 351, 355.[17]

Arthur contends that merely providing a law library, without counsel, failed to ensure that he would be able to avail himself of the state or federal court process in any meaningful way. However, the *Bounds* court specifically concluded that states must supply a law library *or* counsel. 430 U.S. 817 (1977). The *Giarratano* court specifically concluded that the *Bounds* "meaningful access" language did not abrogate the subsequent conclusion in *Finley* that states were not required to provide counsel for inmates in post conviction proceedings. *Giarratano*, 492 U.S. at 11-12.

In summary, Arthur has not established that he was actually injured by Alabama's scheme for providing inmate access to the courts. *Lewis*, 518 U.S. at 351. He did not avail himself of the procedure for obtaining an attorney under Rule 32.7 and he cannot now show that he would have been denied counsel had he pursued that avenue of relief. Furthermore, he has provided no support for any claim that the death row inmates at Holman Prison have inadequate access to library facilities. In short, the State did not place any unconstitutional impediment to Arthur's filing of his federal habeas petition sufficient to statutorily toll the AEDPA limitations period.

---

[17] In *Helton v. Sec'y for the Dep't of Corrections*, the Eleventh Circuit found that equitable tolling was not warranted based on allegations that prison library facilities lacked the latest amendments to the habeas statute where the inmate made no specific allegations about his attempts to otherwise obtain the statute. *Helton*, 259 F.3d 1310 (11th Cir. 2001).

## IV.    Equitable Tolling

AEDPA's statute of limitations can be equitably tolled "when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000); *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999). Equitable tolling is an extraordinary remedy which is typically applied sparingly. *Steed*, 219 F.3d at 1300.

To obtain the benefit of equitable tolling, the petitioner bears the burden of showing (1) "extraordinary circumstances;" (2) which prevented him from timely filing his petition; and (3) due diligence. *Helton v. Sec'y for the Dep't of Corrections*, 259 F.3d 1310 (11th Cir. 2001).[18] The "extraordinary circumstances" standard applied by the Eleventh Circuit focuses on the circumstances surrounding the late filing, rather than the circumstances surrounding the underlying conviction. *Id.* at 1314-15. The petitioner bears the burden of proving entitlement to equitable tolling. *Jones v. United States*, 304 F.3d 1035, 1040 (11th Cir. 2002).  Arthur argues that his failure to file a timely petition is due to the State's failure to provide him with notice, legal assistance, visits from investigators who wanted to help him, or adequate law library facilities.

First, Arthur argues that he did not receive the certificate of judgment triggering the limitations period and he was not represented by counsel when it was issued on April 7,

---

[18] Arthur contends that, because there is a particular need for collateral review of capital cases, the threshold at which a court is willing to find the "extraordinary circumstances" to warrant tolling must be lower, citing *Fahy v. Horn*, 240 F.3d 239, 245 (3d Cir. 2001). *But see Cantu-Tzin v. Johnson*, 162 F.3d 295 (5th Cir. 1998)(denying stay of execution where petitioner filed a time-barred habeas petition and no facts warranted equitable tolling). The Eleventh Circuit has not indicated that the standard for equitable tolling of the AEDPA statute of limitations should be different in capital and non-capital cases.

1998.[19] The Eleventh Circuit considered a similar argument in *Drew v. Dep't of Corrections*, 297 F.3d 1278, 1287 (11th Cir. 2002). Drew claimed equitable tolling applied to his delay in filing because he did not receive a court order until almost a year after it was issued. *Id.* The Eleventh Circuit rejected this argument because Drew "made virtually no effort to ascertain the status" of his claim and his lack of diligence ultimately prevented him from filing his habeas petition until long after the AEDPA limitations period had expired. *Id.* The court said,

> A lengthy delay between the issuance of a necessary order and an inmate's receipt of it might provide a basis for equitable tolling if the petitioner has diligently attempted to ascertain the status of that order and if the delay prevented the inmate from filing a timely federal habeas corpus petition.

*Id.* at 1288, *citing Knight v. Schofield*, 292 F.3d 709 (11th Cir. 2002). Arthur has made no attempt to show he diligently attempted to ascertain the status of his case in the state court. In view of the long period of time in which Arthur did nothing to pursue his claims, his failure to show that the lack of notice prevented him from making a timely filing, and his failure to show he attempted to ascertain the status of his case, this court will not say he acted with diligence with regard to the notice.

Second, Arthur contends the statute should be equitably tolled because he was unable to obtain legal assistance. He claims Holman Prison inmates have no access to paralegal or attorney assistance. Arthur Affidavit, Doc. 36. However, Arthur is not entitled to counsel on collateral review and his failure to procure outside counsel is not an

---

[19] The State presented evidence tending to show that Arthur was aware that his initial appeal through the state courts was complete and that the Alabama Supreme Court had issued a final ruling on March 20, 1998, even though no certificate of judgment was filed 18 days thereafter as required by Ala. R. App. P. 41(a).

extraordinary circumstance warranting equitable tolling. Even if his failure to obtain private counsel were extraordinary, Arthur has not shown he acted with due diligence. His extensive mail and internet campaign to obtain private counsel did not satisfy his obligation to pursue his habeas claims with diligence.[20]

Third, Arthur contends the State hampered his efforts to obtain outside counsel by placing restrictions on his ability to communicate with anyone who might have been able to help him. He presents evidence showing that the warden of Holman Prison refused to permit visits from investigators who were interested in his case.[21] In this regard, the court notes that the record includes copies of numerous letters Arthur sent in his attempt to find private counsel. *See, e.g.* Doc. 36, Ex. A and B. The voluminous correspondence belies his claim that he was unduly restricted in his search for private representation. Moreover, restrictions on visitors for prison inmates is not an extraordinary circumstance and Arthur's evidence that he tried to meet with private investigators does not show that he diligently pursued his claims.

Finally, Arthur contends his efforts to obtain post-conviction relief were hampered by the State's failure to provide adequate law library facilities. As discussed above, Arthur limited his contentions to the death row library and did not acknowledge the existence of

---

[20] Arthur's claim that he failed to file a timely petition because he lacked counsel is peculiarly lacking in force in view of the evidence that Arthur insisted on acting as his own counsel during his trial. Particularly in this case, this court is unwilling to say that a quest for counsel, without more, showed diligence in pursuing habeas claims.

[21] Arthur does not claim the warden's action was unconstitutional. The Constitution does not require that prisoners be able to conduct generalized research, but only that they be able to present their grievances to the courts. *Lewis v. Casey*, 518 U.S. at 360. As the *Lewis* court noted, even as to constitutional rights, certain restrictions are permissible if they are related to legitimate penological interests.

the general prison library. There is no evidence the general prison library was inaccessible or otherwise inadequate. Furthermore, like the petitioner in *Helton,* Arthur makes no showing that he asked for the amendments to the habeas corpus statute or otherwise made an independent effort to determine the limitations period. 259 F.3d at 1314.[22] Again, the evidence fails to show an extraordinary circumstance beyond the petitioners control. And, like the petitioner in *Helton*, Arthur has not shown he was diligent in ascertaining the applicable limitations period.

Arthur finally argues that, even if these factors did not separately amount to extraordinary circumstances, combined together they satisfy his burden. To the contrary, nothing is extraordinary about an inmate who is subject to limitations on visitors and who must follow procedures to obtain counsel and library materials. Only Arthur's failure to avail himself of those procedures is extraordinary, but that failure was not outside his control. Other circuits have concluded that a lack of legal knowledge is not an extraordinary circumstance warranting equitable tolling. *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000); *Felder v. Johnson*, 204 F.3d 168, 171-72 (5th Cir. 2000); *and see Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993)(ignorance of post-conviction remedies does not excuse a procedural default). Moreover, Arthur has not shown he exercised due diligence in pursuing his claims within the limitations period. *Sandvik*, 177 F.3d at 1271-72. "Employment of equitable tolling in [these circumstances] would cause the precise abuse that the AEDPA

---

[22]The District Court found *Helton* received misinformation from his counsel regarding the applicable statute of limitations, but the Eleventh Circuit concluded the attorney's miscalculation or mistake was not an extraordinary circumstance. *See Steed v. Head*, 219 F.3d 1298 (11th Cir. 2000).

24

was enacted to prevent by creating opportunities for convicted prisoners to delay filing motions for post-conviction relief . . . ." *Jones*, F.3d at 1044.

## V.   Conclusion

Arthur's petition for habeas corpus relief is barred by the AEDPA limitations period. The court has examined Arthur's claims of actual innocence, statutory tolling and equitable tolling and finds them without merit. Accordingly, the petition will be DISMISSED with prejudice. The "Motion for Leave to Conduct Discovery," Doc. 33 will be DENIED. A separate order in conformity with this opinion will be entered.

Done, this 4th of December, 2002.

Edwin Nelson
United States District Judge